Paul LOVEDAY and Californians for Smoking and No Smoking Sections, Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.

No. 81–2061.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1982.

Decided May 10, 1983.

---

Paul Loveday (pro se), for petitioners.

Cal P. Saunders, Atty., F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., David Silberman, Atty., F.C.C., Robert B. Nicholson and Neil R. Ellis, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Mark C. Del Bianco, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondents.

Before MacKINNON, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge:

The Communications Act of 1934, 47 U.S.C. § 317 (1976 & Supp. V 1981), and the regulations of the Federal Communications Commission, 47 C.F.R. § 73.1212 (1981), require licensed broadcast stations to identify the sponsors of paid political advertisements at the time those advertisements are broadcast. The licensee is under a duty, moreover, to make a reasonably diligent inquiry to learn, in order to identify, the true sponsor of the advertisements when the licensee has reason to think that it is someone other than the apparent sponsor. 47 U.S.C. § 317(c) (1976). This case concerns the scope of the licensees' duty to investigate.

Petitioners challenge the Commission's conclusion that California radio and television stations adequately discharged their obligation to investigate and to identify the true sponsor of political advertisements opposing an initiative before the voters of California on a 1980 referendum. Had the electorate approved that initiative, Proposition 10, the resulting law would have required separate smoking and no smoking areas in most enclosed public places, places of employment, and educational or health facilities. California voters rejected the proposition.

The advertisements in question were paid for by a political action committee called Californians Against Regulatory Excess ("Regulatory Excess" or "CARE"). Stations broadcasting the advertisements identified that committee as the sponsor. Petitioners, Paul Loveday and a political action committee that supported the initiative, Californians for Smoking and No Smoking Sections (or "Yes on 10"), claim that they furnished the stations with sufficient information to require them either to identify the tobacco industry as the true sponsor or, at a minimum, to investigate more diligently. This court has jurisdiction to review the Commission's contrary decision under 47 U.S.C. § 402(a) (1976) and 28 U.S.C. §§ 2342, 2344 (1976).

We affirm because we conclude that, on these facts, the licensees were not required to inquire further into the actual sponsorship of the political advertisements. Indeed, we have substantial doubt that the Commission could require licensees to do more.

## I.

## A.

On September 26, 1980, Richard Kalish, a representative of Yes on 10 and an associate of petitioner Loveday, wrote to all California radio and television stations asserting that the tobacco industry was sponsoring Regulatory Excess' advertising campaign and was supplying Regulatory Excess with almost all of its funds. He pointed out that Regulatory Excess had, according to its recent campaign finance disclosure statement, been purchasing more radio and television time than its stated resources would permit. He also stated that the tobacco industry had provided almost all of the $6.5 million expended to defeat a similar proposition in 1978. These considerations, Kalish wrote, made it "apparent" that the tobacco industry was virtually the sole source of funds for Regulatory Excess' efforts. The letter directed the licensees' attention to Commission sponsorship identification provisions, which, according to Kalish, required the California licensees "both to discover and to disclose the fact of the Tobacco Industry's sponsorship of the advertising so the public can know 'by whom it is being persuaded.'" Kalish argued that there was "affirmative deception" involved in identifying Regulatory Excess as a California entity when it received virtually all its funds from sources outside California. Kalish expressed the hope that the licensees would satisfy their sponsorship identification obligations without further prodding, but he also threatened to file a complaint with the Federal Communications Commission or to take other action should the stations fail to satisfy their sponsorship identification obligations. The letter did not document Kalish's allegations.

Receiving no response from any of the California stations, Kalish wrote to them again on October 3. His three-page letter reiterated and amplified both his claim that Regulatory Excess was an agent for the tobacco industry and his analysis of the sponsorship identification requirements.[1]

---

1. The new allegations Kalish offered were: (1) a pollster had concluded that, since tobacco industry spending for ads had become an issue in 1978 and had caused a backlash, the tobacco industry might have lost the Proposition 5 campaign if it had spent more money; (2) the tobacco industry had hired an advertising firm for Regulatory Excess; (3) the tobacco industry as part of its campaign had caused to be propagated "numerous public and private statements" to the effect that tobacco industry funding was not necessary for Regulatory Excess' operations and was probably not present; (4) the tobacco industry waited until the state

These additional allegations were also undocumented. Kalish asked the stations to identify Regulatory Excess' advertisements as "Paid for by the Tobacco Industry" and warned that Yes on 10 would bring legal action against any stations that did not comply by October 8.

Regulatory Excess responded to Kalish's first letter by sending each licensee a letter from its chairman, David Bergland, outlining the committee's purpose, structure, and campaign efforts to date, as well as a legal memorandum concerning the sponsorship identification rules. In addition, some stations specifically requested an answer to Kalish's allegations from Regulatory Excess. Vigo Nielsen, counsel for Regulatory Excess, replied to at least some of these requests. Nielsen indicated that Regulatory Excess was not an agent for the tobacco industry. He declined to comment upon the tobacco industry's political motives or policies but acknowledged that various tobacco companies, after concluding that a "hands-off" approach might be interpreted as support for Proposition 10, had contributed to Regulatory Excess' campaign. Nielsen also noted that Regulatory Excess was just beginning the process of soliciting contributions from California voters. He dismissed Kalish's threatened legal actions as "diversionary tactics." Finally, he referred to the previously-provided memorandum giving his interpretation of the sponsorship identification requirements, and he appended a copy of the contribution section of Regulatory Excess' state campaign finance report.

According to petitioners, 58 of the 155 California stations that had broadcast commercials for Regulatory Excess replied to Kalish's letters, though only 11 of these stations addressed the sponsorship identification question. No licensee, apparently, stopped identifying the advertisements as paid for by Californians Against Regulatory Excess.

## B.

On October 16, 1980, Loveday and Yes on 10 requested a declaratory ruling from the Federal Communications Commission. They alleged that the tobacco industry was the principal behind Regulatory Excess' campaign against Proposition 10 and claimed that the California licensees had failed to satisfy their sponsorship identification obligations. They asked the Commission to declare that the tagline "Paid for by Californians Against Regulatory Excess" violated these obligations and must be replaced by the words, "Paid for by the Tobacco Industry." Because the California vote was to occur only several weeks later, petitioners asked the Commission to give their petition expedited consideration.

Petitioners presented to the Commission, as they have presented to this court, an extensive recital of the factual basis for their charges. They also submitted a wide variety of exhibits, ranging from newspaper and trade journal articles to affidavits signed by Loveday. These submissions were designed to prove that the tobacco industry was the real sponsor of Regulatory Excess' advertisements. Whether that is true, however, is beside the point. The issue before the Commission was whether the licensees were put to a duty to identify the tobacco industry as the sponsor or to inquire further about possible parties behind Regulatory Excess. Petitioners' elaborate case before the Commission was not presented to the licensees. Any duty they may have had could arise only from Kalish's two letters and Regulatory Excess' reply.

The Commission asked Regulatory Excess for a response, and that committee replied

---

campaign finance reporting deadline, September 23, had passed before financing any advertising for Regulatory Excess; (5) 98% of the $389,099 received by Regulatory Excess and reported in that September 23 statement came from the tobacco industry; (6) the small sum Regulatory Excess received from nonindustry sources resulting from its mail solicitation, which was financed by the tobacco industry, was, according to direct-mail fundraising experts, outweighed by the cost of the mailing; (7) Regulatory Excess had purchased approximately $1 million of broadcast time since September 23; and (8) all but $3,000 of the money provided to Regulatory Excess by tobacco companies had come from non-California sources.

to petitioners' application, in accordance with the Commission's request for expedition, on October 24, two days after receiving it. Regulatory Excess described its efforts to reply to the inquiries it had received from the California broadcasters regarding its relationship with the tobacco companies. We need not detail that response, much of which went to the issue of the tobacco industry's control of Regulatory Excess, for the same reason that we do not set out petitioners' evidence.

## C.

The Broadcast Bureau, acting under authority delegated by the Commission, 47 C.F.R. §§ 0.71, 0.281 (1980), denied petitioners' application on October 30. Letter from the Broadcast Bureau to Paul Loveday, JA at 2, *reported at In re Request for Declaratory Ruling of Paul Loveday and Californians for Smoking and No Smoking Sections,* 87 F.C.C.2d 492, 493 (1981). Identifying the issue as "whether the California broadcast station licensees have failed to exercise reasonable diligence to identify the sponsor of the CARE advertisements," *id.* at 496, the Bureau concluded that the stations had met their obligations. The Bureau further observed that the sponsorship identification requirements obligated a licensee to make a reasonably diligent effort to identify the sponsor of broadcast material but did not make a broadcaster an insurer of a sponsor's representations. *Id.* at 496–97. Relying upon an earlier decision, *VOTER,* 46 Rad.Reg.2d (P & F) 350 (1979), a case similar to this one, the Bureau held that the California stations had acted reasonably. 87 F.C.C.2d at 497. The Bureau added, however, that a decision to attribute Regulatory Excess' commercials to the tobacco industry would have been equally reasonable. *Id.* Turning to the question of editorial control, the Bureau concluded that, despite petitioners' allegation, admitted by Regulatory Excess, that the tobacco companies had provided Regulatory Excess with virtually 100% of its funds, there was no "conclusive evidence" that the tobacco industry exercised editorial control over Regulatory Excess' advertising campaign. *Id.*

Finally, the Bureau concluded that there was no evidence that the California licensees had dismissed this matter without exercising reasonable diligence to learn whether the tobacco companies were exercising editorial control over Regulatory Excess. *Id.* at 497–98.

## D.

Upon petitioners' application for review, the Commission affirmed the Bureau's decision. 87 F.C.C.2d at 492 (Order). The Commission noted that the Bureau's decision "was based primarily on a finding that the licensees did not act unreasonably," and it agreed with the Bureau that the information submitted by the parties did not demonstrate that the tobacco companies exercised editorial control over Regulatory Excess' advertisements. *Id.* The Commission modified the Bureau's ruling in only one respect; it struck the word "conclusive" from the Bureau's ruling in order to avoid the implication that the FCC would require a complainant conclusively to establish editorial control in cases like this. *Id.* The Commission accepted the Bureau's decision in all other respects and denied petitioners' application for review.

This petition followed.

## II.

Though petitioners suggest a number of standards of review, the law on this subject is clear. The Broadcast Bureau and the Commission rendered their decisions under the authority given by 5 U.S.C. § 554(e) (1976) and 47 C.F.R. § 1.2 (1981) to "issue a declaratory ruling to terminate a controversy or remove uncertainty." The ruling challenged here was issued in a specific factual context and resolved only the issues presented by petitioners' application. This declaratory ruling therefore "belongs to the genre of adjudicatory rulings." *Chisholm v. FCC,* 538 F.2d 349, 364 n. 30 (D.C.Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976). *See FCC v. Pacifica Foundation,* 438 U.S. 726, 734; 98 S.Ct. 3026, 3032, 57 L.Ed.2d 1073 (1978). Petitioners have made no attempt to distinguish *Chisholm.* As a consequence, in reviewing the FCC decision, this court must ask, as we did

in *Chisholm,* whether the Commission's action was arbitrary, capricious, an abuse of discretion, or contrary to law.[2]

III.

 Both the Communications Act and the Commission's regulations require that a broadcast licensee identify the sponsor of any paid matter transmitted and that the licensee "exercise reasonable diligence" to learn who the sponsor is.[3] This standard, according to petitioners, "requires the exertion of every effort" by licensees to identify the real sponsors of paid material that is

---

2. In *Chisholm,* the FCC had issued a declaratory ruling, reversing a long-standing interpretation, that press conferences and debates between federal candidates were exempt from the equal time requirements of 47 U.S.C. § 315 (1976) in certain circumstances. We upheld that action by a 2–1 vote. The majority applied the "arbitrary and capricious" standard, 538 F.2d at 364, and the dissent did not take issue with the majority on this point. *Id.* at 366–96 (Wright, J., dissenting).

3. Section 317 of the Communications Act, 47 U.S.C. § 317, provides in pertinent part:

(a)(1) All matter broadcast by any radio station for which any money, service or other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person: *Provided,* That "service or other valuable consideration" shall not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast unless it is so furnished in consideration for an identification in a broadcast of any person, product, service, trademark, or brand name beyond an identification which is reasonably related to the use of such service or property on the broadcast.

(2) Nothing in this section shall preclude the Commission from requiring that an appropriate announcement shall be made at the time of the broadcast in the case of any political program or any program involving the discussion of any controversial issue for which any films, records, transcriptions, talent, scripts, or other material or service of any kind have been furnished, without charge or at a nominal charge, directly or indirectly, as an inducement to the broadcast of such program.

. . . .

(c) The licensee of each radio station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable such licensee to make the announcement required .by this section.

. . . .

(e) The Commission shall prescribe appropriate rules and regulations to carry out the provisions of this section.

The applicable regulation is 47 C.F.R. § 73.-1212 (1980), which provides in pertinent part:

(a) When a broadcast station transmits any matter for which money, service, or other valuable consideration is either directly or indirectly paid or promised to, or charged or accepted by such station, the station, at the time of the broadcast, shall announce (1) that such matter is sponsored, paid for, or furnished, either in whole or in part, and (2) by whom or on whose behalf such consideration was supplied: . . . .

(b) The licensee of each broadcast station shall exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any matter for broadcast, information to enable such licensee to make the announcement required by this section.

. . . .

(e) The announcement required by this section shall, in addition to stating the fact that the broadcast matter was sponsored, paid for or furnished, fully and fairly disclose the true identity of the person or persons, or corporation, committee, association or other unincorporated group, or other entity by whom or on whose behalf such payment is made or promised, or from whom or on whose behalf such services or other valuable consideration is received, or by whom the material or services referred to in paragraph (d) of this section are furnished. Where an agent or other person or entity contracts or otherwise makes arrangements with a station on behalf of another, and such fact is known or by the exercise of reasonable diligence, as specified in paragraph (b) of this section, could be known to the station, the announcement shall disclose the identity of the person or persons or entity on whose behalf such agent is acting instead of the name of such agent. Where the material broadcast is political matter or matter involving the discussion of a controversial issue of public importance and a corporation, committee, association or other unincorporated group, or other entity is paying for or furnishing the broadcast matter, the station shall, in addition to making the announcement required by this section, require that a list of the chief executive officers or members of the executive committee or of the board of directors of the corporation, committee, association or other unincorporated group, or other entity shall be made

broadcast. Petitioners' Opening Brief at 24c. The Commission interprets the statute and its own regulations to impose a much less stringent obligation: a licensee confronted with undocumented allegations and an undocumented rebuttal may safely accept the apparent sponsor's representations that he is the real party in interest.

We agree with the Commission's interpretation of its statutory authorization and of its own regulations. We agree not merely because the Commission's interpretation is entitled to deference but also because we have grave doubts that the Commission could, in circumstances like these, require more of the licensees than it did in this case. A duty to undertake an arduous investigation ought not casually be assigned to broadcasters. A variety of considerations, ranging from practical ones of administrative feasibility to legal ones involving constitutional difficulties, support that view. We would be reluctant, therefore, to find a power in the Commission to require more of licensees than it has required here unless there existed rather clear evidence that Congress intended to vest such a power. But an examination of the Communications Act, its legislative history, and the evils that Congress addressed does not reveal an intention to require more of licensees than the Commission required here.

### A.

The Commission's authority in this area is conferred by section 317 of the Communications Act, 47 U.S.C. § 317 (1976 & Supp. V 1981).[4] Section 317 contains three subsections of particular relevance.

Subsection (a)(1) provides that if a licensee broadcasts any "matter" for which "any money, service or other valuable consideration" has been "directly or indirectly" given or promised to the licensee by "any person," the licensee must announce that its broadcast has been "paid for or furnished, as the case may be, by such person" at the time the broadcast is presented.

A proviso to subsection (a)(1) states that the announcement need not be made for services or property donated without charge or at a nominal charge. The proviso's exemption is narrowed by subsection (a)(2) which states that nothing in the section shall preclude the Commission from requiring "an appropriate announcement" when a licensee broadcasts any political program or program discussing a controversial issue for which the licensee has received any type of broadcast material, even if no monetary consideration is involved.

Subsection (c) requires a station to "exercise reasonable diligence to obtain from its employees, and from other persons with whom it deals directly in connection with any program or program matter for broadcast, information to enable [it] to make the announcement required by this section." In contrast to subsection (a)(1), subsection (c) refers only to persons with whom a station deals directly and thus indicates that the station may rely on the data provided by such a person to determine whether the party paying is the real party in interest. In its terms, then, the "reasonable diligence" required by subsection (c) does not mandate a full-scale investigation by a broadcaster and is satisfied by appropriate inquiries made by the station to the party that pays it for the broadcast.

### B.

Legislative history tends to confirm the understanding of the licensee's duty indicated by the statute's text. Section 317 traces its lineage to section 19 of the Radio Act of 1927, ch. 169, 44 Stat. 1162, 1170.

1. The Radio Act of 1927, the first comprehensive federal regulation of broadcasting, was primarily a "traffic control" meas-

---

available for public inspection at the location specified by the licensee under § 73.3526 of this chapter. If the broadcast is originated by a network, the list may, instead, be retained at the headquarters office of the network or at the location where the originating

station maintains its public inspection file under § 73.3526 of this chapter. Such lists shall be kept and made available for a period of two years.

. . . .

4. See note 3 *supra*.

ure authorizing the newly created Federal Radio Commission to eliminate the chaos created by the rapidly increasing number of private broadcasters who often used the same wavelengths in the same vicinities. *National Broadcasting Co. v. United States*, 319 U.S. 190, 210–13, 63 S.Ct. 997, 1006–08, 87 L.Ed. 1344 (1943); *see Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 375–77 & nn. 4–5, 89 S.Ct. 1794, 1798–99, 23 L.Ed.2d 371 (1969). The sponsorship identification provision of the Act occupied a humble position in the regulatory design and went virtually unnoticed.

As originally proposed, the predecessor to the 1927 bill, H.R. 7357, did not contain such a provision. *To Regulate Radio Communication: Hearings on H.R. 7357 Before the House Comm. on the Merchant Marine and Fisheries*, 68th Cong., 1st Sess. 1–7 (1924) (reprinting bill (hereinafter *House Hearings on H.R. 7357*). During the hearings, however, Representative Ewin Davis recommended a provision requiring broadcasters to identify paid advertisements as such. He suggested that the requirement should be similar to an existing postal law that required all mailed, second-class material such as newspapers or magazines clearly to identify all paid advertisements.[5] *House Hearings on H.R. 7357* at 60. Insofar as

this suggestion was subsequently addressed in the hearing, the attention devoted to it was cursory. *See, e.g., id.* at 84–85. Section 6 of the bill reported out of the committee required, in the words of the House Merchant Marine and Fisheries Committee, that "all matters broadcasted for which any money or other valuable consideration is paid shall be announced as advertising at the time the same is broadcasted." H.R. Rep. No. 719, 68th Cong., 1st Sess. 6 (1924). The House of Representatives never voted on the bill. H. Warner, *Radio and Television Law* § 92, at 769 & n. 38 (1948).

During the next Congress, Representative Wallace White introduced H.R. 5589, which, in section 5, contained a sponsorship identification provision based on section 6 of H.R. 7357. *To Regulate Radio Communication: Hearings on H.R. 5589 Before the House Comm. on the Merchant Marine and Fisheries*, 69th Cong., 1st Sess. 5 (1926) (reprinting H.R. 5589) (hereinafter *House Hearings on H.R. 5589*).[6] Like its predecessor, section 5 of H.R. 5589 was the subject of limited discussion.[7] The Committee Report accompanying H.R. 5589 referred to section 5 only briefly and stated simply that the purpose of this provision was "to make sure that advertising shall not be hidden from the listener." H.R.Rep. No. 404, 69th Cong., 1st Sess. 3 (1926).

---

**5.** Act of Aug. 24, 1912, ch. 389, 37 Stat. 539, 553, *amended,* Act of Mar. 3, 1933, ch. 207, 47 Stat. 1486 (codified at 39 U.S.C. § 234 (1952)), *readopted as amended,* Act of Sept. 2, 1960, Pub.L. No. 86–682, 74 Stat. 578, 671 (codified at 39 U.S.C. § 4367 (1970)), *repealed,* Postal Reorganization Act of 1970, Pub.L. No. 91–375, § 2, 84 Stat. 719.

**6.** Section 5 provided:
 All matters broadcasted by any radio station for which service[,] money or any other valuable consideration is directly or indirectly paid or promised to or charged or accepted by, the station so broadcasting, shall be announced as "advertising" at the time the same is so broadcasted: *Provided,* That when the advertisement or publicity sought consists solely of the announcement of the name, business, and address of the person, firm, company, or corporation paying for the feature broadcasted it shall be sufficient to announce that such feature is "paid for or furnished by" such person, firm, company, or corporation.

**7.** Again, only two witnesses addressed section 5 in their testimony. One, Commerce Department Solicitor Stephen Davis, stated that the Department, the executive department then responsible for regulating radio, was "complete[ly] indifferen[t]" towards section 5. *House Hearings on H.R. 5589* at 133. The other witness, Herbert Smith, a representative of the National Carbon Company, which sponsored an entertainment program known as the "Ever-Ready Hour," recommended an amendment to section 5 to eliminate any confusion about what it required when a firm sponsored an entire entertainment program rather than a commercial. *Id.* at 82–85. Representative Davis reiterated his concern that radio stations should be required to identify advertisements, lest the audience be deceived into believing that the station itself sponsored the broadcast, *id.* at 83–87, but disagreed with Mr. Smith's amendment solely on questions of language. *Id.* With only minor changes in language, the committee adopted the amendment.

On the House floor, another bill, H.R. 9971, which also contained a sponsorship identification provision, was substituted for H.R. 5589. 67 Cong.Rec. 5473–78 (1926). The House engaged in a lengthy debate over H.R. 9971, but section 5 was rarely addressed. There was no discussion of the proposed sponsorship identification section, and the only amendment offered to this provision, one which would have eliminated the committee's proposal to permit alternative forms of announcements, was defeated. *Compare* 67 Cong.Rec. 5488 (1926) (proposed amendment by Rep. Cellar) *with id.* at 5574 (vote on amendment). The House passed H.R. 9971 with section 5 unchanged.

The Senate referred H.R. 9971 to the Committee on Interstate Commerce, which had already held its own hearings on two Senate bills to regulate radio communications. *Hearings on S. 1 and S. 1754 Before the Senate Comm. on Interstate Commerce,* 69th Cong., 1st Sess. (1926). Neither of these proposals contained a sponsorship identification section, *id.* at 1 (reprinting S. 1), 1–8 (reprinting S. 1754), and neither the witnesses who testified at these hearings nor the Senators who were present proposed that one should be added. Ultimately, the Committee substituted a greatly revised bill for H.R. 9971, *see* S.Rep. No. 772, 69th Cong., 1st Sess. 1 (1926), in which section 5 was nonetheless incorporated in the same form that the House had passed. *See* 67 Cong.Rec. 12,502 (1926) (remarks of Senator Dill). The only reference to the sponsorship identification requirement in the Senate Committee's Report was the statement that "[a]ll matter broadcast for hire shall be announced as paid material . . . ." S.Rep. No. 772, *supra,* at 4.

In the Senate debate on its version of H.R. 9971, there was no substantial discussion of the sponsorship identification provision. Section 5 of the House proposal, as approved by the Senate Interstate Commerce Committee, was left unchanged in the final modified version of H.R. 9971 that was passed by the Senate and referred to a Conference Committee. 67 Cong.Rec. 12,-618 (1926). The compromise reached by the Conference Committee in turn adopted section 5, renumbered as section 19 of the Conference Committee bill, without substantial change. H.R.Conf.Rep. No. 1886, 69th Cong., 2d Sess. 18 (1927). After some debate, both chambers accepted the Conference proposal, including section 19. 68 Cong.Rec. 2580 (1927) (House vote); 68 Cong.Rec. 4155 (1927) (Senate vote). The President later signed the Radio Act of 1927 into law.[8]

The legislative history of the Radio Act of 1927 shows that the sponsorship identification provision imposed only a very limited obligation upon broadcasters: to announce that a program had been paid for or furnished to the station by a third-party and to identify that party. We have neither found nor been pointed to any indication that Congress contemplated that section 19 might require broadcasters to investigate whether a party purchasing commercial time was acting on his own behalf or as an agent for someone else.

Similarly, we have not discovered any evidence outside the formal legislative history that suggests that Congress or the legal community believed that section 19 required broadcasters to undertake investigations. The contemporary literature thoroughly canvassed what were then thought to be the major provisions and purposes of the Act,[9] and the sponsorship identification

---

**8.** As enacted this section read as follows:
> SEC. 19. All matter broadcast by any radio station for which service, money, or any other valuable consideration is directly or indirectly paid, or promised to or charged or accepted by, the station so broadcasting, from any person, firm, company, or corporation, shall, at the time the same is so broadcast, be announced as paid for or furnished, as the case may be, by such person, firm, company, or corporation.

Ch. 169, 44 Stat. 1162, 1170.

**9.** *See* Ashby, *Legal Aspects of Radio Broadcasting,* 1 Air L.Rev. 331 (1930); Caldwell, *The Standard of Public Interest, Convenience or Necessity as Used in the Radio Act of 1927,* 1 Air L.Rev. 295 (1930); Caldwell, *Censorship of Radio Programs,* 1 J.Radio L. 441 (1931); Chamberlain, *The Radio Act of 1927* (pts. 1–2), 13 A.B.A.J. 343, 368 (1927); Chapman, *The Power of the Federal Radio Commission to*

provision was hardly noticed. The commentators who made reference to section 19 limited their discussion to a restatement of its language.

2. In the years immediately following the passage of the 1927 Act, section 19 provoked no controversy whatever. Congress returned to the subject of communications in 1934 not to redress major perceived inadequacies in the existing legislation but simply to refine the system it had already established. As stated in section 151 of the Communications Act of 1934,[10] its purpose was to promote the effective and efficient use of communications for the public and private weal by augmenting existing regulatory authority and centralizing that authority in the hands of one agency, the newly created Federal Communications

Commission.[11] The legislative history of the 1934 Act reveals no dissatisfaction with the existing sponsorship identification requirement. Section 19, renumbered as section 317, was neither amended nor debated.[12]

3. After 1934, Congress devoted little if any attention to section 317 until scandals in the broadcast industry surfaced in the late 1950s. It was learned at that time that record companies made secret payments to disc jockeys to play certain records (a practice known within the industry as "payola") and that game show contestants had been provided with answers to questions beforehand in order to enhance the dramatic quality of the programs. Both the Attorney General[13] and congressional committees[14]

*Regulate or Censor Radio Broadcasts,* 1 Geo. Wash.L.Rev. 380 (1933); Davis, *The Radio Act of 1927,* 13 Va.L.Rev. 611 (1927); Davis, *International Radio Relations,* 16 Geo.L.J. 400 (1928); Donovan, *Origin and Development of Radio Law* (pts. 1–3), 2 Air L.Rev. 107, 349, 468 (1931); Nordhaus, *Judicial Control of the Federal Radio Commission,* 2 J.Radio L. 447 (1932); Rowley, *Problems in the Law of Radio Communication,* 1 U.Cinn.L.Rev. 1 (1927); Webster, *Our Stake in the Ether,* 17 A.B.A.J. 369 (1931); Webster, *Notes on the Policy of the Administration with Reference to the Control of Communications,* 5 Air L.Rev. 107 (1934); White, *History of Radio Legislation in the United States,* 2 J.Radio L. 179 (1932); Note, *The Constitutionality of the 1927 Radio Act and Amendments,* 1 Air L.Rev. 127 (1930); Note, *Radio Act of 1927—Constitutionality of Davis Amendment,* 4 Air L.Rev. 182 (1933); Note, *The Radio Act of 1927,* 27 Colum.L.Rev. 726 (1927).

**10.** The Communications Act of 1934, ch. 652, § 151, 48 Stat. 1064 (codified as amended at 47 U.S.C. § 151 *et seq.* (1976)).

**11.** See *National Broadcasting Co. v. United States,* 319 U.S. at 214, 63 S.Ct. at 1008; *FCC v. Pottsville Broadcasting Co.,* 309 U.S. 134, 137, 60 S.Ct. 437, 438, 84 L.Ed. 656 (1940); 1 A. Socolow, *The Law of Radio Broadcasting* § 47, at 54; § 48, at 55 (1939); H. Warner, *Radio and Television Law* § 102, at 795–96 (1948); McManus, *Federal Legislation Regulating Radio,* 20 S.Cal.L.Rev. 146, 154 (1947).

**12.** The Senate, House, and Conference Committee Reports each indicated that section 317 of the new Act readopted section 19 of the 1927 Act. S.Rep. No. 781, 73d Cong., 2d Sess. 8 (1934); H.R.Rep. No. 1850, 73d Cong., 2d Sess.

2, 7 (1934); H.R.Conf.Rep. No. 1918, 73d Cong., 2d Sess. 47 (1934). The only difference between section 19 and section 317 was that section 317 omitted the reference to "firm, company, or corporation" after the reference to "person" in section 19.

Like its predecessor, section 317 of the 1934 Communications Act did not receive any special attention by the legal community. Commentary on section 317 was, again, typically limited to a restatement of the terms of the statute. *See, e.g.,* Note, *Communications Act of 1934,* 21 Va.L.Rev. 318, 322 & n. 31 (1935).

**13.** Report to the President by the Attorney General on Deceptive Practices in Broadcasting Media (1959), *reprinted in Investigation of Regulatory Commissions and Agencies, Interim Report of the Subcomm. on Legislative Oversight,* H.R.Rep. No. 1258, 86th Cong., 2d Sess. (1960).

**14.** *Investigation of Television Quiz Shows: Hearings Before the Legislative Oversight Subcomm. of the House Comm. on Interstate and Foreign Commerce,* 86th Cong., 1st Sess. (1959); *Investigation of Regulatory Commissions and Agencies, Interim Report of the Subcomm. on Legislative Oversight,* H.R.Rep. No. 1258, 86th Cong., 2d Sess. (1960); *Responsibilities of Broadcasting Licensees and Station Personnel: Hearings on Payola and Other Deceptive Practices in the Broadcasting Field Before the Legislative Oversight Subcomm. of the House Comm. on Interstate and Foreign Commerce,* 86th Cong., 2d Sess. (1960); *Communications Act Amendments: Hearings on Conditional Grants, Pregnant Procedure, Local Notice, Local Hearings, Payoffs, Suspension of Licenses, and Deceptive Practices in Broadcasting Before the Communications and Power Subcomm. of the House Comm. on Interstate*

investigated. The practices disclosed led Congress to amend section 317 in 1960. The most important feature of the amendments, for present purposes, was the addition of subsection (a)(2).

As noted above, the language of subsection (a)(2) authorized the FCC to require licensees to make "an appropriate announcement" if the licensee broadcast polit-

ical or controversial material, even if it had received that material free of charge. The legislative history pertinent to that subsection is sparse but indicates that Congress adopted it in order to ratify regulations adopted by the Commission in 1944,[15] which had expanded a licensee's obligations in several ways. See H.R.Rep. No. 1800, 86th Cong., 2d Sess. 24–25 (1960); S.Rep. No. 1857, 86th Cong., 2d Sess. 5 (1960).[16] In

*and Foreign Commerce,* 86th Cong., 2d Sess. (1960). *See also Proposed Amendments to FCC Act of 1934: Hearing on S. 1898 Before the Communications Subcomm. of the Senate Comm. on Interstate and Foreign Commerce,* 86th Cong., 2d Sess. (1960).

**15.** These regulations provided in pertinent part:

Section 3.409 *Sponsored programs, announcement of.*

(a) In the case of each program for the broadcasting of which money, services, or other valuable consideration is either directly or indirectly paid or promised to, or charged or received by, any radio broadcast station, the station broadcasting such program shall make, or cause to be made, an appropriate announcement that the program is sponsored, paid for, or furnished, either in whole or in part.

(b) In the case of any political program or any program involving the discussion of public controversial issues for which any records, transcriptions, talent, scripts, or other material or services of any kind are furnished, either directly or indirectly, to a station as an inducement to the broadcasting of such program, an announcement shall be made both at the beginning and conclusion of such program on which such material or services are used that such records, transcriptions, talent, scripts, or other material or services have been furnished to such a station in connection with the broadcasting of such program: *Provided, however,* That only one such announcement need be made in the case of any such program of five minutes' duration or less, which announcement may be made either at the beginning or the conclusion of the program.

(c) The announcement required by this section shall fully and fairly disclose the true identity of the person or persons by whom or in whose behalf such payment is made or promised, or from whom or in whose behalf such services or other valuable consideration is received, or by whom the material or services referred to in paragraph (b) hereof are furnished. Where an agent or other person contracts or otherwise makes arrangements with a station on behalf of another, and such fact is known to the station, the announcement shall disclose the identity of the person

or persons in whose behalf such agent is acting instead of the name of such agent.

(d) In the case of any program, other than a program advertising commercial products or services, which is sponsored, paid for or furnished, either in whole or in part, or for which material or services referred to in paragraph (b) hereof are furnished, by a corporation, committee, association or other unincorporated group, the announcement required by this section, shall disclose the name of such corporation, committee, association or other unincorporated group. In each such case the station shall require that a list of the chief executive officers or members of the executive committee or of the board of directors of the corporation, committee, association or other unincorporated group shall be made available for public inspection at one of the radio stations carrying the program.

9 Fed.Reg. 14,734 (1944) (codified at 47 C.F.R. § 3.409 (Supp.1944)).

**16.** The House Report stated:

*Proposed section 317(a)(2)*

This subsection makes it clear that the instant legislation is not intended to change the Commission's present requirement that an announcement be made in the case of any political program or any program involving the discussion of any controversial issue even where the program matter is furnished without charge or at a nominal charge as an inducement to the broadcast of the program. Thus, an announcement in these circumstances may be required even though, in fact, the matter broadcast is not "paid" matter. However, the Commission in 1944, with the concurrence of the broadcast industry, promulgated a rule to this effect. The broadcast industry at no time has raised objection to the announcement requirement in these situations. In order to provide specific statutory authority for the requirement of an announcement here, the substance of the Commission rule has been included as subsection (a)(2) of the amended section 317.

H.R.Rep. No. 1800, *supra,* at 24–25. The Senate Report only stated that "Subsection (a)(2) of proposed section 317 would permit the Commission to continue in existence its rule regard-

particular, subsection (c) of these regulations required that a licensee "fully and fairly disclose the true identity of the person or persons by whom or in whose behalf" the licensee was paid or from whom the licensee received political or controversial program material. 9 Fed.Reg. 14,724 (1944) (codified at 47 C.F.R. § 3.409(c) (Supp. 1944)). In addition, "[w]here an agent or other person contracts or otherwise makes arrangements with a station on behalf of another, and such fact is known to the station," the station was required to identify the principal rather than the agent when it made the sponsorship announcement. *Id.*

Congress' ratification of these Commission regulations did not impose any burden of independent investigation upon licensees. We have seen that the language of section 317, of itself, does not do so, and it is equally plain that the regulations do not. Subsection (c) of the regulations requires disclosure by the licensee but does not require investigation. The inference that the licensee is required to disclose only what he knows without investigation is fortified by the further statement in subsection (c) that where an agency relationship exists "and such fact is known to the station," the licensee must identify the principal rather than the agent. The regulation did not say, as it easily could have done, that such identification must be made when the licensee could learn of the agency or that the licensee must inquire if circumstances give reason to suspect an undisclosed principal. The regulations Congress ratified imposed an extremely limited duty upon licensees.

Nothing in the legislative history suggests that Congress was aware of any "payola"-like scandals or problems akin to "payola" in the realm of political programming. Nor was Congress acting against a background of significant Commission interpretation of its own regulations that Congress may be presumed to have adopted. The one significant Commission action prior to Congress' 1960 amendment of section 317

came in *Albuquerque Broadcasting Co.,* 40 F.C.C. 1 (1946). The licensee there had written to the Commission for clarification of its responsibilities with respect to the identification of sponsors of political broadcasts. The Commission's reply stated, somewhat unhelpfully, that a licensee's compliance would be judged on a case-by-case basis. *Id.* The Commission gave only one illustration:

> For example, if a speaker desires to purchase time at a cost apparently disproportionate to his personal ability to pay, a licensee should make an investigation of the source of the funds to be used for payment. This is particularly true in a case where the speaker has previously appeared on similar broadcasts sponsored by others, and announces the fact that he is resuming his broadcasts.

*Id.* The principle being applied by the Commission was, apparently, that a licensee had not merely a duty to announce the true sponsor when that sponsor's identity was known to the licensee, but that circumstances might raise such a suspicion in the mind of a reasonable man that the licensee was placed under a duty to take affirmative action to learn the identity of the true sponsor. The Commission took no position, however, on how extensive the required investigation must be. For example, if the speaker insisted that he was the real principal, must the licensee demand to know the source of his funds, require an affidavit of him, and interview persons who might know the situation? Does the extent of the licensee's obligation vary according to the remoteness of the witnesses and evidence and the licensee's resources? The singularly unhelpful nature of the Commission's advice was highlighted by its further observation: "Nor would the fact that an independent investigation is necessary in a particular case, automatically relieve a station from its responsibility to make its facilities available to the person in question." *Id.*[17]

---

ing political programs or controversial issues." S.Rep. No. 1857, *supra,* at 5.

17. In a series of opinions rendered between 1958 and 1960, which coincided with the period during which the Attorney General and Con-

Had Congress known of *Albuquerque Broadcasting,* and had it intended to ratify that letter of advice in amending section 317, the result would be merely that a licensee was put upon some undefined duty of inquiry when rather obtrusive facts suggested that the purported sponsor of a political broadcast was not the actual sponsor. There is, however, no indication that Congress even knew of the Commission's interpretation. *Albuquerque Broadcasting* was not explicitly referred to in the House Report, the Senate Report, or the floor debates in either chamber. *See* H.R.Rep. No. 1800, *supra;* S.Rep. No. 1857, *supra.* Thus, the Commission regulations as they existed and were interpreted at the time Congress ratified them by enacting subsection (a)(2) of section 317 give no reason to impute to Congress any desire to impose upon licensees a duty of wide-ranging investigation. Certainly, Congress expressed no such intention.[18]

The only remaining question then is whether subsequent actions by the Commission have expanded, and can legitimately expand, a licensee's duty to investigate.

## C.

Following the 1960 statutory amendments, the Commission in 1963 issued new regulations that consolidated the existing regulations and the 1960 amendments. *In re Applicability of Sponsorship Identification Rules,* 40 F.C.C. 141, 143–44 (1963) (codified at 47 C.F.R. § 73.119 (1964)). The Commission did not decide another case involving political broadcasts until *WHAS, Inc.,* 40 F.C.C. 190 (1964).

That case arose when an advertising agency purchased air time from WHAS to present "The Chandler Years in Review," a disparaging commentary on Albert Benjamin Chandler's tenure as Governor of Kentucky. Two days later, an agency employee told WHAS that the broadcast would be paid for by "The Business Friends for Breathitt," Breathitt being Chandler's opponent in a gubernatorial campaign. Other facts known to the station also gave it reason to know that the Breathitt campaign was paying for the telecast. Within a week, the advertising agency "corrected" its phone call to say that "The Committee for Good Government" would sponsor the telecast instead, and the program was broadcast under that name. 40 F.C.C. at 191–92.

The FCC held that WHAS violated its sponsorship identification obligation because the station was required to notify the public of the principal's identity, where it

gress were conducting their investigations, the Commission held that several licensee stations had violated their section 317 obligations by failing to disclose that they had received free summaries of certain Senate hearings from the National Association of Manufacturers. 40 F.C.C. at 12–65. Although the Commission noted in some of these cases that material of a politically controversial nature should alert licensees to be especially diligent about the obligations imposed by section 317, the Commission's pronouncement was made in the context of licensee failure to make any announcement at all and thus does not indicate the extent of licensee responsibility to reject an identification provided by the party who supplied the material. The Commission also ordered all licensees to inform the Commission of all broadcasts they had made for compensation in the past year and any internal controls they had established. *In re Sponsorship Identification Compliance,* 40 F.C.C. 66 (1959). The Commission also issued a discussion of its policies and practices, *In re Sponsorship Identification of Broadcast Material,* 40 F.C.C. 69 (1960), among

other rulings. None of these rulings sheds significant light on the extent of any duty to investigate in circumstances such as those here where an identification has been made and the purported sponsor has submitted facially plausible information to support that identification.

**18.** The Senate Report describes the reasonable diligence requirement of subsection (c) as follows:

> The term "reasonable diligence" would require the licensee to take appropriate steps to secure such information, but it would not place a licensee in the position of being an insurer, nor does this condition permit a licensee to escape responsibility for sponsorship announcements by inactivity on his part.

S.Rep. No. 1857, *supra,* at 6. This explanation, while it establishes that a licensee cannot discharge its duty by passively ignoring sponsorship information it might easily obtain, nonetheless indicates that a licensee need not go behind the information it receives to guarantee its accuracy.

was known to the licensee, rather than simply identify the agent purchasing the air time.

The Commission sued to recover the forfeiture it had imposed. The district court, however, held that WHAS had not violated the sponsorship identification rules, *United States v. WHAS, Inc.,* 253 F.Supp. 603 (W.D.Ky.1966). The Sixth Circuit affirmed, holding that subsection (d) of the regulations [19] gave the station the right to identify the payer as the sponsor even though subsection (c) might have been read to require that the actual sponsor be named when known to the station. *United States v. WHAS, Inc.,* 385 F.2d 784 (6th Cir.1967). The court remarked that it was "by no means precluding the FCC from adopting a Regulation calculated to require a station to make reasonable efforts to go beyond a named 'sponsor' for a political program in order to ascertain the real party in interest for purposes of announcement." *Id.* at 788.

The Commission did not respond to the *WHAS* decision by amending its regulations until 1975. The new regulations provided that where an agent makes arrangements with a station on behalf of another "and such fact is known or by the exercise of reasonable diligence . . . could be known to the station," the sponsorship announcement must disclose the name of the principal rather than the agent. 52 F.C.C.2d 701, 714 (1975). The Commission dismissed the argument of the National Broadcasting Company that it did not have the statutory authority to require a licensee to search for the true identity of a sponsor by relying upon the Sixth Circuit's *dictum* in *United States v. WHAS, Inc.,* 385 F.2d at 788. 52 F.C.C.2d at 708–09.

Prior to Loveday's petition, only the Commission has had occasion to interpret the 1975 regulations, as it did in *VOTER,* 46 Rad.Reg.2d (P & F) 350 (1979). Westchester County, New York, had on its ballot a proposition to establish a county utility agency and to explore the development of a public power authority for the county. VOTER, a citizens committee that sup-

ported the proposition, complained that stations in the New York City area had broadcast paid advertisements in opposition to the proposition and had identified the advertisements as paid for by Westchester Citizens Against Government Takeover. In fact, VOTER alleged, the true sponsor was Consolidated Edison Company of New York, from which Westchester Citizens derived all or a very substantial part of its funds. Westchester Citizens replied that it had accepted substantial funds from Consolidated Edison but that no officer or employee of the utility was a member or eligible for membership in Westchester Citizens and that the latter paid for and controlled the content of the advertisements. The Broadcast Bureau ruled:

> Under the [Commission's] policies . . . , we cannot prohibit any licensee who chooses to do so from *adding* the identification you urge. However, we cannot conclude [that] any licensee, in evaluating the facts before it regarding the advertisement, failed to exercise reasonable diligence by accepting the representations of Westchester Citizens. The substantial proportion of Con Edison's role in Westchester Citizens funding might suggest a basis for further inquiry to some licensees. On the other hand the Westchester Citizens by-laws, represented assertion of editorial control over these advertisements, and the weight of precedent suggest that those licensees who accepted Westchester Citizens' advertisements as offered did so in good faith and without closing their eyes to any attempted misrepresentation. Indeed, some licensees may conclude, either on the facts thus far provided by the Westchester Citizens, or additional information not now before us, that, in its view, "Con. Edison" alone is the appropriate identification. In such a case, we would have no basis for finding that the licensee has acted unreasonably.

46 Rad.Reg.2d (P & F) at 352.

As the excerpt above suggests, the Commission has never indicated in enforcement

---

**19.** The relevant regulations were identical to those cited in note 15 *supra.*

proceedings that section 317 or its own regulations require a station to conduct any investigation or to look behind the plausible representations of a sponsor that it is the true party in interest.

### D.

In light of our examination, we must reject petitioners' contention that the legislative history of the Communications Act requires the Commission to impose upon licensees a duty to investigate when they receive conflicting representations of the type involved here. If Congress intended to impose a duty of licensee investigation in a case of this sort, that intention was never made explicit in the statute or its history.

There are, moreover, good reasons why this court should not read into the statute or regulations the licensee duty petitioners seek to establish. The result, if we agreed with petitioners' argument, would be to create an administrative quagmire, to establish standards so variable as to invite abuse, and to raise possible constitutional questions. These are not merely reasons for a court to stay its hand, they are also reasons to doubt that Congress could have intended what petitioners argue.

Petitioners have been rather indefinite about what the California broadcasters were required to do when confronted by Kalish's allegations and Bergland's counter-allegations. The reasons for that vagueness may be suggested by an attempt to imagine the details of any process of further investigation. Broadcast companies are not grand juries. They have no power to subpoena documents or to compel the attendance of witnesses. They could, of course, refuse to broadcast unless all relevant documents and witnesses were produced for examination. If we make the rather implausible assumption that executives of the apparent sponsor, the advertising agency, and the alleged real sponsor would all cooperate, the result would be to judicialize the process of being allowed to utter a political statement. Having provided no clear indication that it contemplated such results, Congress cannot be presumed to have intended to place that burden, expense, and delay upon political speech. In the absence of such cooperation by the parties with whom stations deal, the alternative would be a field investigation by agents of the stations, involving requests for documents and interviews and, perhaps, observation of suspected persons. Again, the burden, expense, and delay would be considerable and in many cases possibly prohibitive. Section 317 can hardly have been designed to turn broadcasters into private detectives.

Even supposing a searching investigation to be a realistic possibility, the result of requiring it would be an administrative quagmire. Broadcasters differ greatly in their resources and personnel, ranging from large stations in urban areas to small stations that often have no more than one person on the premises.[20] Similarly, the "sponsors" whom they would have to investigate may be large or small, nearby or geographically remote, cooperative or recalcitrant. The intensity of the investigation that will be practicable will vary according to the combination in a particular case of these and other factors. In the present case, for example, a spectrum of different duties of investigation would have to be applied to the radio and television licensees in California. The administrative burden such a system would impose on the Commission would surely strain, and might well be beyond, its powers. The series of hearings involved would probably require years to complete. Equally problematic is the question of fairness to the licensees, who would have to guess in every situation what the Commission would later find to be "reasonable diligence." Indeed, we cannot completely overlook the opportunities for abuse that such a variable and unknown standard would present should some future Commission use its powers for political purposes.[21]

---

20. See 106 Cong.Rec. 14,310–11 (1960) (remarks of Rep. Avery).

21. It has been said that the fairness doctrine lends itself to use for partisan political pur-

This constitutes an additional reason to insist that the regulatory rules to which licensees are subject be clear and not susceptible to manipulation.

Were we to approve a stringent obligation to investigate, one along the lines petitioners seek, the most likely result would be that many stations, in lieu of incurring the expense of the investigation and the risk that the Commission would later assess their duties differently, would try, possibly by imposing burdensome disclosure requirements on advertisers, to avoid carrying advertisements of the type involved here. If so, opponents of groups sponsoring political messages would have a ready means of harassing and perhaps silencing their adversaries by making charges, however baseless, that the true sponsor of a political advertisement was someone other than the named sponsor. The rule petitioners seek might, therefore, have the effect of choking off many political messages. Quite aside from any First Amendment difficulties that such a rule might implicate, we are certainly not prepared to say that the public would be benefited from a decline in the number and variety of political messages it receives.[22] Even more certainly, any such decision concerning the public benefits of such a rule should come from Congress and not this court.

Finally, it may not be amiss to note that reading into the silences of the legislative history the duties that petitioners advocate would create a situation that is not entirely free of First Amendment concerns. Supreme Court decisions compel us to recognize that the First Amendment's protections of speech and the press are less strong where the broadcast media are concerned than they are with respect to the print media.[23] "[O]f all forms of communication, it is broadcasting that has received the most limited First Amendment protection." *FCC v. Pacifica Foundation,* 438 U.S. at 748, 98 S.Ct. at 3089. Given the differences in the availability of access to the various types of media and their differences in impact, various rationales have been offered by the Supreme Court for the differences in constitutional protection. The rationale that applies most forcefully in the present context would seem to be the scarcity of available frequencies on the broadcast spectrum.

> Freedom of utterance is abridged to many who wish to use the limited facilities of radio. Unlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation.

poses. *See* F. Friendly, *The Good Guys, the Bad Guys and the First Amendment* (1976).

22. Only last year the Supreme Court wrote that "[i]n a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by, the erring candidate's political opponent." *Brown v. Hartlage,* 456 U.S. 45, 61, 102 S.Ct. 1523, 1533, 71 L.Ed.2d 732 (1982). We believe the same can be said for ballot initiatives like the ones here, even when it is the identity of the speaker that is in issue rather than the content of his speech. Indeed, petitioners themselves admit that, despite the tobacco industry's alleged efforts to cover its trail during the Proposition 5 campaign, the California voters were well aware of the industry's involvement. JA at 22, 55; Petitioners' Opening Brief at 5, 12.

23. *Compare Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (ban on anonymous leaflets invalid), *and Miami Herald Publishing Co. v. Tornillo,* 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974) (state law providing right of reply to political candidate attacked by newspaper invalid), *with Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1981) (FCC fairness doctrine and implementing rules valid), *and CBS, Inc. v. FCC,* 453 U.S. 367, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981) (statute providing political candidates right of access to broadcast stations and FCC's implementation of statute valid). *Compare Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (ban on residential "For Sale" signs violates First Amendment), *with Capital Broadcasting Co. v. Mitchell,* 333 F.Supp. 582 (D.D.C.1971) (three-judge court), *aff'd sub nom. Capital Broadcasting Co. v. Acting Attorney General,* 405 U.S. 1000, 92 S.Ct. 1289, 31 L.Ed.2d 472 (1972) (mem.) (upholding ban on broadcast advertising of cigarettes over First Amendment challenge). *See also Lewis Publishing Co. v. Morgan,* 229 U.S. 288, 33 S.Ct. 867, 57 L.Ed. 1190 (1913) (upholding, over First Amendment challenge, the postal law requiring second-class mail to identify advertisements that was the basis for section 317).

*National Broadcasting Co. v. United States,* 319 U.S. at 226, 63 S.Ct. at 1014. Today when the number of broadcast stations not only far exceeds the number when the Communications Act was adopted and the number when the *National Broadcasting Co.* case was decided but rivals and perhaps surpasses the number of newspapers and magazines in which political messages may effectively be carried, it seems unlikely that the First Amendment protections of broadcast political speech will contract further, and they may well expand. As matters now stand, the protections accorded printed messages are not wholly irrelevant to broadcast freedoms. Thus, while it has been held unconstitutional for a city ordinance to require disclosure of the author of a printed statement, *Talley v. California,* 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), such disclosure may apparently be required where the statement is broadcast. Nonetheless, even in broadcasting, where the law's attempt to discover the true utterers of political messages becomes so intrusive and burdensome that it threatens to silence or make ineffective the speech in question, the law presses into areas which the guarantee of free speech makes at least problematic. Before we would construe a statute or a regulation to have that effect, we would require a far clearer congressional directive that stations affirmatively seek out true sponsors than we have here.[24] The failure of Congress to address these questions thus provides an additional reason for doubting that Congress intended any rule such as petitioners urge. Had Congress so intended, there surely would have been some discussion of the practicalities of investigation, the difficulties of administra-

tion, the potential unfairness, and the constitutional questions that would follow from such a rule. The legislative history is bare of any such concerns.

These observations, which we note again are mentioned not to raise constitutional doubts but to discern legislative intent, determine the outcome of this case. The licensees had before them two short letters from Kalish containing unsupported allegations that the tobacco industry rather than Regulatory Excess was the true sponsor of the advertisements opposing Proposition 10 and demanding that the stations identify the industry as the sponsor. The licensees also had before them Regulatory Excess' replies stating that it was the real sponsor. In these circumstances, we find that the Commission could properly conclude that the stations were not required to investigate further. Indeed, given what we have said, it seems at least doubtful that the Commission was free to decide otherwise.[25] There may be cases where a challenger makes so strong a circumstantial case that someone other than the named sponsor is the real sponsor that licensees, in the exercise of reasonable diligence, would have to inform the named sponsor that they could not broadcast the message without naming another party. But that case is not before us today.

The Commission's decision that the California licensees satisfied their sponsorship identification obligation is not arbitrary, capricious, or an abuse of discretion. The Commission's interpretation of its own regulations as applied in this case is reasonable and consistent with section 317 of the Communications Act.

**24.** In construing the statute and regulations, we thus follow the tradition of adopting the reading that will avoid rather than implicate constitutional questions, *see United States v. Security Industrial Bank,* —— U.S. ——, 103 S.Ct. 407, 412–14, 74 L.Ed.2d 235 (1982); *NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 509, 99 S.Ct. 1313, 1323, 59 L.Ed.2d 533 (1979) (Brennan, J., dissenting); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 137–38, 81 S.Ct. 523, 529–530, 5 L.Ed.2d 464 (1961); *International Association of Machinists v. Street,* 367 U.S. 740,

749, 81 S.Ct. 1784, 1789, 6 L.Ed.2d 1141 (1961); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**25.** We have no occasion to address the Broadcast Bureau's dictum that, given the conflicting statements before them, the licensees were free to choose to comply with petitioners' request by simply substituting the tagline suggested by petitioners for that supplied by the party with whom they dealt.

The decision of the Commission is therefore

*Affirmed.*